MARIFARMS OIL & GAS, INC. and
Marifarms Oil & Gas 1977, a
Limited Partnership, Appellants,

v.

John E. WESTHOFF, Appellee.

No. 2–90–044–CV.

Court of Appeals of Texas,
Fort Worth.

Jan. 15, 1991.

Woodward & Shaw, and John R. Woodward, Dallas, for appellants.

Borden, Hand & Westhoff, and John E. Westhoff, Weatherford, for appellee.

Before JOE SPURLOCK, II, FARRIS and MEYERS, JJ.

## OPINION

FARRIS, Justice.

Marifarms Oil & Gas, Inc. (the Corporation) and Marifarms Oil & Gas 1977, a Limited Partnership (the Partnership) appeal a judgment against them awarding John Westhoff, trustee, $347.00 in accrued and unpaid royalties, and terminating their interest in the Roark oil, gas and mineral lease on property now held by Westhoff. The judgment also awarded Westhoff $6,000.00 as attorney's fees.

Appellants raise nine points of error: there was no evidence or insufficient evidence that the Corporation owed any duty to Westhoff, either contractually or otherwise (points 1 & 2); the court erred in awarding accrued and unpaid royalties because there was no evidence or insufficient evidence that Westhoff complied with the lease and furnished the Partnership the instrument or certified copy thereof which granted him the right to the royalties (points 3 & 4); there was no evidence or insufficient evidence to establish that a reasonably prudent operator would not have continued to operate the Roark No. 1 Well under the circumstances (points 6 & 7); the court erred by decreeing that the lease terminated by its own terms because there was insufficient evidence that the Roark No. 1 Well ceased producing in paying quantities, and alternatively, there was no evidence that the Roark No. 1 Well is the only well on the leasehold and that all others (if any) have ceased producing in paying quantities (points 5 & 8); and finally, the court erred by awarding attorney's fees because there was insufficient evidence that Westhoff presented his claim to either appellants or a duly authorized agent (point 9).

We affirm the trial court's decision, finding sufficient evidence to support the court's findings that appellants owed a duty to Westhoff and that the lease terminated by its own terms.

In points of error one and two, appellants claim there was no evidence, or alternatively, insufficient evidence, of the Corporation owing any duty to Westhoff because the Corporation was only the operator, and not the working interest owner. In points three and four, appellants claim Westhoff never furnished the Partnership with the instruments by which Westhoff claimed an interest in the royalties. They argue that because the Partnership is the working interest owner, Westhoff was required to send the notice of his interest to it, not to the Corporation. We overrule these four points because the evidence shows that the Corporation appeared to be the owner and because Westhoff used due diligence in attempting to notify it of the change in ownership.

The leasehold property was transferred to Westhoff in July of 1986. Signs posted on the property showed the Corporation as the operator, natural gas run statements were delivered to the Corporation, and the records of the Parker County Taxing Authority listed the Corporation as the operator *and* the working interest owner. In these records, the Corporation's mailing address is listed as Hearthstone Village, South Londonderry, Vermont.[1] This was also the address where the gas run statements were sent. Relying on this information, Westhoff sent notice to the Corporation, the apparent owner of the working interest, at the South Londonderry address. Twice this letter was returned unclaimed. At trial, Paul Hayes, the general operator and sole employee of both the Corporation and the Partnership, testified that the correct address for both entities is approximately 20 miles away in Stratton Mountain, Vermont, which is where he keeps all the business records. He stated that the South Londonderry address is his wife's address (from whom he is not estranged) and that she was the previous president of the Corporation. He said the address changed when she turned the Corporation over to him; however, he could provide no records to show that he ever changed the address

---

1. Whereas the documents of this case reflect the spelling as "Londondry," the zip code on them is correct and the various items of correspondence were properly delivered, except as noted, without the misspelling ever posing a problem.

with the taxing authority, nor corrected what he called "the mistake" of the taxing authority in naming the Corporation as the working interest owner. And while he argued the impropriety of the South Londonderry address for the purpose of serving notice upon the Corporation, it is interesting to note that citation for this case was served upon both the Corporation and the Partnership at that same address.

 Although no findings of fact or conclusions of law were filed with this appeal, the judgment of the trial court implies all necessary findings of fact in support thereof. *See In the Interest of W.E.R.*, 669 S.W.2d 716, 717 (Tex.1984) (per curiam); *Burnett v. Motyka*, 610 S.W.2d 735, 736 (Tex.1980) (per curiam). Therefore, for this court to sustain a "no evidence" point of error, the record must disclose one of the following: (1) a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla of evidence; or (4) the evidence establishes conclusively the opposite of a vital fact. *Commonwealth Lloyd's Ins. Co. v. Thomas*, 678 S.W.2d 278, 288 (Tex.App.—Fort Worth 1984, writ ref'd n.r. e.); Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 TEXAS L.REV. 361 (1960). Alternatively, in sustaining an "insufficient evidence" point of error, the record must reflect why the finding is factually insufficient or is so against the great weight and preponderance as to be manifestly unjust; shock the conscience; or clearly demonstrates bias. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex.1986) (opinion on reh'g). But where the implied findings of fact are supported by the evidence, as they are here, it is the duty of this court to uphold the judgment on any theory of law applicable to the case. *Point Lookout West, Inc. v. Whorton*, 742 S.W.2d 277, 278 (Tex.1987) (per curiam); *W.E.R.*, 669 S.W.2d at 717. This is so regardless of whether the trial court articulates the correct legal reason for the judgment. *Gulf Land Co. v. Atlantic Refining Co.*, 134 Tex. 59, 131 S.W.2d 73, 84 (1939). The record reflects that the judgment of the trial court on the issues contained in points of error one through four was soundly based on the evidence above and we affirm it.

██ In appellants' fifth point of error, they contend the court erred in decreeing their interest in the Roark lease terminated by its own terms because there was insufficient evidence the well had ceased producing in paying quantities. We overrule this point as the implied finding is supported by the evidence.

Westhoff's exhibit number 15, a document prepared by the first attorney retained by appellants for this case, shows that there was no flow from the well for a period ranging from June 3 to August 25, 1986, or approximately 84 days. This evidence is supported by the lack of run sheets for that same period of time. The Roark lease contains both a 60–day cessation of production clause, and a 90–day shut-in well clause. For this period of time, approximately 84 days, the well was shut-in, and therefore, the shut-in clause controls. *See Rogers v. Osborn*, 152 Tex. 540, 261 S.W.2d 311, 313 (1953). A shut-in well is not producing in paying quantities. *See Riley v. Meriwether*, 780 S.W.2d 919, 923 (Tex.App.—El Paso 1989, writ denied) (defining production); *also see Garcia v. King*, 139 Tex. 578, 164 S.W.2d 509, 511 (1942) ("production" means production in paying quantities). However, a lease will not terminate for lack of production if the shut-in clause is complied with. *See Amber Oil and Gas Co. v. Bratton*, 711 S.W.2d 741, 743 (Tex.App.—Austin 1986, no writ). This was not done here.

According to the clause in the instant case, if a well is shut in, the lessee *may* pay an annual royalty equal to the amount of the delay rentals, in the same manner as payment of the delay rentals, and if such payment is made, it shall be considered under all provisions of the lease that gas is being produced in paying quantities for one year from the date of payment. It was held in *Freeman v. Magnolia Petroleum Co.*, 141 Tex. 274, 171 S.W.2d 339 (1943),

that the optional character of payment coupled with the provision that it will be considered that gas is being produced if such payment is made indicates that advance payment is required to keep the lease alive. *Id.* 171 S.W.2d at 341. The question remaining concerns the timeliness of that advance payment. In *Shell Oil Co. v. Goodroe*, 197 S.W.2d 395 (Tex.Civ.App.—Texarkana 1946, writ ref'd n.r.e.), that court held that if a lease contained both a cessation of production clause and a shut-in royalty provision, then to preserve the lease, it was necessary to make the shut-in royalty payment within the time period stated in the cessation of production clause. *Id.* at 398. The supreme court then took up the matter in *Gulf Oil Corp. v. Reid*, 161 Tex. 51, 337 S.W.2d 267 (1960) and pulled in the reins even stronger deciding that even where the shut-in royalty payment was made one month after the well was shut-in, it did not continue the lease. The court reasoned that the lease expired automatically at the end of the primary term or a later date when there was neither production nor a substitute therefor. *Id.* 337 S.W.2d at 271–72. The court did not, however, overrule *Goodroe*, but merely distinguished it from the facts before it in *Reid*. A later federal case which arose in Texas did follow the reasoning in *Goodroe* holding again that the shut-in royalty payment must be paid within the time given in the cessation of production clause else the lease terminates. *See Duke v. Sun Oil Co.*, 320 F.2d 853 (5th Cir.), *reh'g granted on questions of proper anniversary date and timeliness of tender*, 323 F.2d 518, 519 (5th Cir.1963). No shut-in royalty was ever paid by the parties before us, not within the 60 days given by the cessation of production clause, nor at all. For approximately 84 days there was no production and no substitute for production and therefore the trial court was correct in decreeing that the lease terminated by its own terms.

■ Appellants also argue in their eighth point of error that the court erred in its determination because Westhoff provided no evidence that the Roark No. 1 Well was the only well on the leasehold and that all other wells (if any) had also ceased to produce in paying quantities. This point is overruled.

Westhoff admitted the existence of a second well on the leasehold in his pleadings where he stated "prior to the expiration of the primary term of said ... lease, a well, capable of producing in paying quantities, was drilled; said well being designated as the Roark No. 1 Well. Thereafter ... a second well was drilled ... and was designated the Roark No. 2 Well." No reference was made as to any production coming from this second well, nor indeed, was any reference made to it by the witnesses at trial. The field hand employed to change the charts on the wells held by the Partnership only testified as to Roark No. 1 Well, and when that well was shut-in, he did not go out to the property. Presumably, if the second well had been producing, it still would have required servicing even when the first did not. The son of the owner and operator of both the Corporation and Partnership was employed by his father to serve as the pumper for all wells owned by the Partnership. He also testified of having only to service Roark No. 1 Well on the Roark leasehold; and in answer to what his job was generally, he said "[j]ust checking *it* out and make [sic] sure *it's* still pumping." [Emphasis added.]

On cross-examination of both witnesses, no testimony was elicited concerning any other wells or work done in connection with other pumping wells, nor did appellants' attorney make any reference to such in opening or closing statements. Other evidence before the court, which included gas run statements, and a table of actual flow periods prepared by the appellants' first attorney in this cause, gives reference only to the Roark No. 1 Well. No other gas run statements (from any other well) were provided to Westhoff or presented to the court. Although neither party actually came before the court and said "Well no. 2 produces" or "Well no. 2 does not produce," we hold that in the absence of any evidence showing production from any source on the leasehold other than Roark No. 1 Well after admission that the second well exists, and in light of the evidence and

testimony presented, the trial court was able to soundly infer that there was no other production on the leasehold. The testimony and records provided more than a scintilla of evidence to support this finding, and the case record does not disclose any one of the other three reasons (given above under points one through four) this court could sustain this point of error. *See Commonwealth Lloyd's*, 678 S.W.2d at 288. Appellants' argument is overruled.

Because we hold that the lease did in fact terminate by its own terms due to a lack of production in paying quantities, we need not address the appellants' sixth or seventh points of error concerning the continued operation of the well.

■ Appellants' ninth point of error complains that the award of attorney's fees in the amount of $6,000.00 was in error because there was insufficient evidence to establish that Westhoff ever presented his claim to the appellants, or any agent thereof, as required by TEX.CIV.PRAC. & REM.CODE ANN. sec. 38.002 (Vernon 1986). In addition to the evidence discussed under points of error one through four of Westhoff's diligent attempt to notify the Corporation of his claim, Westhoff also made demand upon both appellants orally during a deposition taken more than 30 days prior to trial. Section 38.002 does not require any particular form of presentment; in fact, section 38.005 states that this chapter on attorney's fees is to be liberally construed so as to promote its underlying purposes. *See* TEX.CIV.PRAC. & REM.CODE ANN. sec. 38.005 (Vernon 1986). Additionally, in construing the predecessor statute to section 38.002 (former TEX.REV.CIV.STAT.ANN. art. 2226),[2] more than one court has held that an oral demand is sufficient. *See Huff v. Fidelity Union Life Ins. Co.*, 158 Tex. 433, 312 S.W.2d 493, 500 (1958); *Karol v. Presidio Enterprises, Inc.*, 622 S.W.2d 638, 640 (Tex.App.—Austin 1981, no writ); *King Optical v. Auto. Data Processing*, 542 S.W.2d 213, 217 (Tex.Civ.App.—Waco 1976,

writ ref'd n.r.e.). Consequently, this point is overruled.

Judgment of the trial court is affirmed.

---

2. Act of June 6, 1979, 66th Leg., ch. 314, 1979 Tex.Gen. Laws 718, *repealed by* Act of June 16, 1985, 69th Leg. ch. 959, sec. 9, 1985 Tex.Gen. Laws 3242, 3322 (current version at TEX.CIV. PRAC. & REM.CODE ANN. sec. 38.002 (Vernon 1986)).